UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>LORENZO CARTER )<br>)<br>) | 3:20-CR-00058 (KAD)<br><br><br><br><br><br>January 13, 2025 |

**MEMORANDUM OF DECISION**
**RE: MOTION FOR JUDGMENT OF ACQUITTAL AND FOR NEW TRIAL**
**(ECF No. 1049)**

Kari A. Dooley, United States District Judge:

Following a jury trial, Defendant Lorenzo Carter was convicted of racketeering conspiracy in violation of 18 U.S.C. § 1962(d), with a special sentencing factor of murder in violation of Conn. Gen. Stat. §§ 53a-54a and 53a-8. Pending before the Court is Carter's post-trial motion for judgment of acquittal and/or a new trial, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure. For the reasons that follow, the motion is DENIED.

**Procedural History**

On July 15, 2021, a federal grand jury returned a Third Superseding Indictment charging Defendants Lorenzo Carter ("Carter") and Joshua Gilbert ("Gilbert"), as well as thirteen others, with a variety of offenses arising out of the defendants' involvement with an alleged street gang and racketeering enterprise known as O.N.E. ECF No. 181. Specifically, Carter and Gilbert were charged with a RICO Conspiracy in violation of 18 U.S.C. § 1962(d). The Indictment included, as special sentencing factors, an allegation that Carter committed the murder (either as principal or aider and abettor), under state law, of Len Smith on August 13, 2018, and that Gilbert committed the murder (either as a principal or aider and abettor), under state law, of Ty'Quess Moore on December 8, 2019. Carter and Gilbert elected to be tried by a jury.

Prior to trial, both Gilbert and Carter filed motions to sever their case from that of the other, ECF Nos. 565, 569, 978, arguing principally that the evidence regarding each murder would present prejudicial spillover as to the defendant not charged in the murder at issue. Carter's motion for severance was renewed shortly before trial, albeit on a different basis, as discussed below. The Court denied Gilbert's motion to sever and Carter's initial motion to sever by written decision on August 2, 2023. ECF No. 808. The Court denied Carter's second motion to sever on the record on October 6, 2023. ECF No. 984.

Jury selection was held on October 16 and 17, 2023. The jury heard evidence over the course of 20 days, commencing on October 18, 2023, and on November 21, 2023, they returned a guilty verdict, to include a determination that Carter had committed the murder of Len Smith and that Gilbert had committed the murder of Ty'Quess Moore. Carter timely made an oral motion for judgment of acquittal or in the alternative for a new trial. Thereafter, Carter timely filed a memorandum in support of the motion. *See* Def.'s Mem. in Supp., ECF No. 1308. The Government filed an omnibus opposition to Carter's post-trial motions which also addressed Gilbert's post-trial motions[1] on November 17, 2024. *See* Gov't Opp'n, ECF No. 1384.

As to his Rule 29 motion for judgment of acquittal, Carter argues only that there was insufficient evidence to support the finding that Carter murdered Len Smith. Significantly, Carter does not challenge the sufficiency of the evidence as it relates to the guilty verdict on Count One, the RICO Conspiracy.[2] As to his Rule 33 motion for a new trial, Carter argues, as he did when he sought severance, that his trial alongside Gilbert deprived him of a fair trial.

---

[1] Gilbert's post-trial motions shall be addressed in a separate decision.

[2] Although Carter does not challenge the jury's guilty verdict in the RICO Conspiracy charge in his Rule 29 motion, his challenge to the jury's finding that he participated in the Len Smith homicide is nevertheless properly raised in a Rule 29 motion. A Rule 29 motion can be the mechanism to challenge the evidentiary basis of any jury determination. *See, e.g.*, *United States v. Jackson*, 335 F.3d 170, 180–81 (2d Cir. 2003) (reviewing district court's ruling on Rule 29 motion that didn't challenge underlying conviction, but only challenged jury's factual finding

2

**Standard of Review—Motion for Judgment of Acquittal**

"Under Rule 29, a district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. A defendant who challenges the sufficiency of the evidence to support his conviction bears a heavy burden. Not only must the evidence be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor, but the jury verdict must be upheld if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (cleaned up).

When evaluating the sufficiency of the evidence, courts must "bear in mind that the jury's verdict may rest entirely on circumstantial evidence." *Id*. "When making a case based on circumstantial evidence, the government need not 'exclude every reasonable hypothesis other than that of guilt.'" *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *Holland v. United States*, 348 U.S. 121, 139 (1954)). Moreover, "it is the task of the jury, not the court, to choose among competing inferences." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). Rule 29 does not provide the trial court with an opportunity to "substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984); *accord United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016). Thus, "the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged

---

under *Apprendi* of the drug quantity); *United States v. Mack*, No. 18-CR-834, 2020 WL 114509, at *3 (S.D.N.Y. Jan. 10, 2020) ("[Defendant] here does not dispute the sufficiency of the evidence of his guilt on either count on which he was convicted. Instead, challenging the jury's special finding as to drug quantity, he argues that the evidence was insufficient to establish that the narcotics conspiracy of which he was convicted (in Count Six) involved one kilogram and more of mixtures and substances containing a detectable amount of heroin."), *aff'd*, No. 20-788, 2022 WL 4391802 (2d Cir. Sept. 23, 2022) (summary order).

is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Guadagna*, 183 F.3d at 130 (citation and internal quotation marks omitted).

**Standard of Review—Motion for a New Trial**

Rule 33 provides that the district court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). "In evaluating a Rule 33 motion, the court must 'examine the entire case, take into account all facts and circumstances, and make an objective evaluation,' keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (quoting *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)). "In other words, there must be a real concern that an innocent person may have been convicted" for the ordering of a new trial to be appropriate. *United States v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006) (cleaned up).

With these legal principles in mind, the Court turns to the merits of Carter's motion.

**The Third Superseding Indictment**

Carter and Gilbert were only charged in Count One of the Third Superseding Indictment, which alleged a RICO Conspiracy. The Indictment alleged that O.N.E., or "Original North End" or "Only North End" (hereinafter "ONE"), was a street gang and racketeering enterprise operating principally out of the Trumbull Gardens housing project in the north end of Bridgeport, also called the "Terrace." The Indictment alleged that Carter and Gilbert, along with seven others , conspired to participate in the ONE enterprise; that the conspiracy included an agreement that at least two

4

racketeering acts would be committed by members of the conspiracy; and that the racketeering acts agreed upon included narcotics distribution, arson, the interstate transportation and possession of stolen motor vehicles, Hobbs Act robberies, possession of firearms, and conspiracy to commit murder of rival gang members. As a special sentencing factor, Gilbert was alleged to have committed the murder of Ty'Quess Moore on December 8, 2019, in violation of state law, Conn. Gen. Stat. §§ 53a-54a and 53a-8. Also as a special sentencing factor, Carter was alleged to have committed the murder of Len Smith on August 13, 2018 in violation of state law, Conn. Gen. Stat. §§ 53a-54a and 53a-8.

Though not legally required, the Indictment detailed multiple overt acts as having been committed in furtherance of the RICO conspiracy, which will be discussed as needed to explain the Court's decision.

**The Evidence at Trial**

The Court heard testimony from 66 witnesses over 20 days. The witnesses included law enforcement officers; experts from the State of Connecticut Office of the Chief Medical Examiner and the state forensic laboratory; lay witnesses; victims (or victim family members); and several cooperating witnesses who themselves had pled guilty to offenses and were awaiting sentencing. Documentary evidence included hundreds, if not thousands, of social media postings by Carter and Gilbert, as well as alleged co-conspirators; group "chats" or texts between co-conspirators; cell phone extractions; cell phone location data; surveillance footage from multiple locations in both Bridgeport and Waterbury; rap videos; crime scene photographs; other photos and videos from various sources, as well as records from internet or telecommunications providers. The physical evidence included multiple firearms; ammunition; shell casings; narcotics; narcotics packaging materials; clothing; multiple cell phones; and DNA samples.

5

**Discussion**

    **Motion for Judgment of Acquittal**

        **The RICO Enterprise[3]**

Although Carter does not challenge the sufficiency of the evidence as to the jury's determination of guilt as to Count One, the RICO Conspiracy charge, the Court, upon review of the evidence summarizes the evidence as follows. The jury could have readily determined that ONE was a street gang associated with and operating principally out of the Trumbull Gardens housing project, also known as the "Terrace." Cooperating witnesses Henry Floy and Jaylen Wilson, himself a member of ONE, described in detail the nature of the gang, the criminal activities of the gang, and the history of the gang. Cooperating witnesses Kyran Dangerfield and Charles Bonilla, both rival gang members, corroborated the testimony regarding the existence and nature of ONE. According to this testimony, ONE members included Ta'Ron Pharr; Carter; Gilbert; Zaire Dedrick; Tyiese Warren; Jamar Traylor; Jaylen Wilson; Jahaz Langston; Amire Newsome; Zakwani Owen; Luis Garcia; Jauwan Edwards; Shakale Brantley; and others (some deceased).

ONE had clothing which included a logo of sorts depicting the gang name; ONE had specific hand signs that communicated membership in ONE; ONE had a unique handshake that members used; ONE gang members used social media to taunt and provoke rival gang members; ONE gang members used social media to communicate with each other, largely in furtherance of gang activities, for example planning to travel to steal cars, planning a robbery, or planning to do a drive by shooting. The Court does not identify all of the voluminous evidence introduced as to the existence and nature of the RICO conspiracy but concludes easily, and Carter does not argue

---

[3] Although not required to prove the existence of the racketeering enterprise under the conspiracy statute, the Indictment included an allegation that the ONE enterprise, in fact, existed. Further, as the Court charged the jury, "[p]roof of the actual existence of a RICO enterprise—though not necessary—can be highly probative as to the existence of the alleged RICO Conspiracy." Jury Instructions, ECF No. 1080, at 15.

otherwise, that the evidence established that ONE was an "association in fact" as contemplated under the RICO statutes whose activities included a pattern of racketeering activity. *See United States v. White*, 7 F.4th 90, 99–100 (2d Cir. 2021) (finding existence of RICO enterprise where gang members sold drugs together and had shared handshake and greetings); *United States v. Davis*, No. 21-1486, 2023 WL 4582002, at *2 (2d Cir. July 18, 2023) (summary order) (same where gang members planned robberies, sold drugs, and publicized gang affiliation on Facebook); *United States v. Donald*, No. 3:21-CR-8 (VAB), 2024 WL 4719233, at *12 (D. Conn. Nov. 8, 2024) (same where gang members used shared hand signs and phrases, had rivalries with other gangs, and sold drugs together).

Further, Carter was identified as a member of ONE by Henry Floy and Jaylen Wilson, making him a member of the RICO conspiracy. Wilson testified that Carter was someone with whom he had participated in car thefts, to include the white Jeep subsequently used in the shooting death of Len Smith. Carter's social media, including his Facebook page, contained references to ONE and ONE gang alliances, such as multiple photographs evidencing his association with ONE. Lt. Amato of the Bridgeport Police Department and member of the gang task force had twice arrested Carter, and on each occasion, Carter was found in possession of a firearm. Further, Carter participated in ONE group chats discussing, *inter alia*, rival gangs, committing acts of violence against rival gangs, as well as acts of violence perpetrated against ONE and its members. Wilson testified that Carter, along with Pharr and Garcia, were members of "Crazy Gang" or "Crazy G" a subset of ONE. Again, as Carter does not challenge the sufficiency of the evidence as it relates to the jury's guilty verdict as to Count One, the Court does not further detail the evidence establishing Carter's participation in the RICO Conspiracy. *See, e.g.*, *Carlisle v. United States*, 517 U.S. 416,

426 (1996) (holding that trial courts lack the inherent power "to acquit for insufficient evidence *sua sponte*, after return of a guilty verdict").

### The Murder of Len Smith

Carter does challenge the sufficiency of the evidence as to the jury's finding that Carter participated in the murder of Len Smith on August 13, 2018. *See supra* at n.2. He relies primarily on the lack of forensic evidence tying Carter to the crime and the Government's questionable reliance on the testimony of Henry Floy, a cooperating witness, and Nate Ocasio to establish Carter's role in the murder.

There is no dispute as to whether Len Smith was a gang member. He was not. He was in the wrong place at the wrong time when, the Government alleges, ONE members Ta'ron Pharr (a/k/a "250"), Lorenzo Carter, and Luis Garcia, driving a stolen Jeep Grand Cherokee, rolled up next to the car Len Smith was in and opened fire into the vehicle. The Government further asserts that Carter was the driver of the Jeep.

The evidence includes video of the shooting, which reveals the following. After midnight on August 13, 2018, the car Mr. Smith was in, a Buick, parked at the intersection of Stratford Avenue and Union Avenue. The driver exited the car and entered the Sunshine Deli.[4] Mr. Smith and his girlfriend, Georgia Carmago, remained in the vehicle. At approximately 12:27 a.m., the Jeep Grand Cherokee drove parallel to the Buick. Three individuals are seen in the Jeep. All three are armed and two appear to be wearing blue gloves. The individuals cannot be identified based upon the surveillance footage. Soon after it arrived, the driver of the Jeep (with his right hand) reaches across the front seat passenger with a gun and appears to fire into the Buick. The front

---

[4] The evidence also established that ONE members knew that East End or East Side gang members frequented the Sunshine Deli.

8

seat passenger also fires at the Buick, and it appears that a back seat passenger fires a single shot at the Buick. The front seat passenger is left-handed. Garcia is left-handed.

Len Smith, who had been sitting in the front seat, was mortally wounded and pronounced dead at 1:07 a.m. Georgia Carmago was severely wounded but did not succumb to her injuries.

Henry Floy, a cooperating witness, testified that he was a close associate of ONE and many of its members. He was very close friends with Garcia. He often went "car-hopping" with ONE members, which was a practice of looking for open cars and stealing anything of value found therein. If the key to the car was also located, the car itself was stolen. Floy testified that he also participated in armed "stains" or robberies with various ONE members. Floy did not grow up in the Terrace, however. He moved to Bridgeport when he was 17 years old and became acquainted and close with ONE and its members through people he met at Central High School. Floy was also a close friend of Nathan Ocasio. Mr. Ocasio testified that he was a close friend of Luis Garcia and Henry Floy, and was an acquaintance of other ONE members, including Carter, Pharr, Brantley, and Owen, but was not himself associated with ONE or a member. Both Floy and Ocasio testified that they regularly hung out in the Terrace.

Regarding the night of the Len Smith homicide, Floy testified that he, Ocasio, Antoine Sistrunk, and Zakwani Owen were hanging out and smoking marijuana, in a Walgreens parking lot, near Ocasio's home, in the early morning hours of August 13, 2018. Brantley arrived at the parking lot with Pharr, Carter, and Garcia in his car. Pharr, Carter, and Garcia were very agitated and nervous. They explained that they had to get rid of the Jeep, that they had shot up "the Ave," and that the Jeep was "hot." Pharr indicated that his gun had jammed and he only was able to shoot once. Carter stated that they had "swiss cheesed" the Buick. Garcia stated that he fired five shots into the car and that he thought a rival gang member was in the car. Garcia also identified

9

Carter as the driver.  At this point, Ocasio entered his residence.  Shortly thereafter, Floy went to Ocasio's home and asked to borrow money for "food."  Ocasio gave him some money.

Floy further testified that after he got money from Ocasio, Sistrunk drove him to a nearby gas station where Floy used the money to fill a gas can with gas.  Floy and Sistrunk then returned to the Walgreens parking lot.  Sistrunk and Brantley drove everyone to Charron Street, where the Jeep was parked.  Carter, Pharr, and Floy got into the Jeep.  Garcia remained in Brantley's car, and Owen remained in Sistrunk's car.  All three vehicles travelled to Indian Well Park.  Once there, Pharr, Floy, and Carter wiped down the inside of the Jeep with bleach and then set it on fire.  Floy rode back to Bridgeport with Brantley and Garcia.  Pharr and Carter rode with Sistrunk.  Along the route back to Bridgeport, the vehicles stopped so that items removed from the Jeep could be thrown into a sewer.

Lastly, Floy testified that Brantley's car ran out of gas on the way back to Bridgeport, leaving Floy, Garcia, and Brantley stranded.  Floy called Ocasio who went to pick up Floy.

Regarding the same night, Ocasio testified that while he, Floy, Sistrunk, and Owen were hanging out at the Walgreens, Brantley arrived, driving an Infiniti, with Garcia, Pharr, and Carter.  Garcia, Pharr, and Carter were acting nervous: "They were fidgeting.  They was real scared."  Ocasio testified that they said they had come from a shooting on "the Ave," which he understood to be Stratford Ave.  The three were talking about getting rid of evidence.  At that point, not wanting to "be part of anything," Ocasio entered his residence.  Soon after, Floy came to his house and borrowed some money for food.

Later in the night, Ocasio got a phone call from Floy and Garcia "because they ran out of gas and they wanted [Ocasio] to come pick them up."  Ocasio went to pick them up, but Garcia was gone by the time he arrived.  Ocasio drove Floy and Brantley home.

10

Following the murder, Ocasio testified that he, Floy, Carter, Pharr, and Garcia were hanging out in the Terrace. He testified that after Floy left, Carter, Pharr, and Garcia began discussing Floy and harming Floy because "[h]e had evidence." Specifically, they discussed shooting Floy. Ocasio left, concerned he might be "evidence" too, and never returned to the Terrace. He also told Floy what he had heard.

The social media posts introduced into evidence established that in the days and weeks following the murder, Floy was branded a "snitch" and a "rat" on social media. Ocasio testified that he followed many ONE members on social media, and that he saw the posts about Floy and he began to be concerned for his own safety. Although Garcia reached out to him by text and on Facebook, Ocasio did not respond. Eventually, Garcia went to Ocasio's home and told him to "hold it down" for him, meaning not to cooperate with the police and that he planned to "run." Garcia also told Ocasio he was with Carter, Pharr, and a man named "Tyler" on the night of the murder, and that Carter had been driving a white Jeep.

The evidence established, and it is not contested, that the Jeep Grand Cherokee was stolen four days earlier, in the early morning hours of August 9, 2018, from a condominium complex in Newburgh, New York. Floy and Wilson both testified that Wilson drove Floy, Carter, Pharr, and Brantley to New York. The theft was captured on surveillance video which revealed Wilson's car with four passengers "car hopping" in the parking lot. The stolen Jeep and Wilson's car were also captured on surveillance video as they crossed over the Newburgh Bridge on the return trip to Bridgeport.

Text messages on the evening of August 12, 2018 between Pharr, Garcia, Carter, and Brantley reveal that Pharr and Garcia met up in the Terrace between 10:30 p.m. and 11:00 p.m. At 11:35 p.m., Carter texted Brantley indicating that he too was going to the Terrace. Location

data from Garcia's phone indicates that Garcia was in a parking lot at Trumbull Gardens at 11:45 p.m. By reasonable inference, he was with Carter and Pharr.

At 11:48 p.m. on August 12, 2018, Garcia's phone was locked. It was not unlocked until 12:36 a.m. on August 13, 2028, a little more than eight minutes after the murder of Len Smith and after the phone was again located in Trumbull Gardens. Further, Garcia's phone was locked from 3:00 a.m. to 3:30 a.m., the time period during which the Jeep was burned.

The Government also relies upon the phone extractions, text messages, social media posts and other digital evidence from Garcia, Brantley, Owen, and Pharr, much of which corroborated the testimony of Floy and Ocasio as to the events which followed the shooting.

Concededly, Floy's statements to law enforcement were initially all over the map and much of what he told the police when first interviewed in August of 2018 was simply not true. And the testimony established that his statements evolved over time, in part because the investigation was revealing more and more information. However, that a person with knowledge of crimes, who himself participated in the destruction of evidence, is not immediately forthcoming when interrogated by the police, is not uncommon. Both Floy and Ocasio were subject to thorough and exhaustive cross-examination. And both testified that Carter admitted his participation in the shooting, which Garcia confirmed when he later told Ocasio that Carter was the driver.

Indeed, Floy's testimony was corroborated by the surveillance video of the murder itself. For example, statements attributed to Garcia, Carter, and Pharr, by Floy, accurately describe the murder. The video reveals that the Buick was, in fact, "swiss cheesed," as purportedly stated by Carter, and it does appear that the back seat passenger only fired one shot, perhaps the result of a gun jamming, as purportedly lamented by Pharr.

In addition, surveillance video from the gas station where the gas was purchased and from the Walgreens confirm the series of events testified to by Floy. Brantley also texted an ONE group chat at 3:29 a.m. that he needed a ride and that he was "all the way near blakam it ran outta gas when we putting the shells in the sewer." The Court does not herein identify all of the evidence on which the jury could have relied in reaching its verdict, but concludes nonetheless that there was ample evidence to support the verdict and certainly no basis upon which to conclude that "no reasonable juror" could have concluded as this jury did.[5]

The motion for a judgment of acquittal is DENIED.

**Motion for a New Trial**

Carter devotes much of his memorandum to the motion for a new trial. He argues that he was deprived of his right to a fair trial because of the antagonistic trial strategy chosen by co-defendant Gilbert.

Additional history is needed to address this argument. As discussed above, Gilbert was charged with the murder of Ty'Quess Moore. He made clear prior to and during trial that he was not going to contest the existence of ONE as a racketeering enterprise or Gilbert's membership in the RICO Conspiracy. Gilbert's defense targeted the Government's ability to prove the murder itself. During closing arguments, Gilbert's lawyer first stated: "First, Mr. Gilbert is not contesting his guilt on the RICO Conspiracy charge." Trial Tr. 11/16/2023 A.M., ECF No. 1347, at 80. He did not discuss the factual particulars of the allegations or concede any of those factual allegations.

---

[5] Carter also asks this Court to consider evidence received and arguments advanced by co-defendant Luis Garcia in connection with a *Fatico* hearing, the subject of which was Garcia's alleged involvement in the Len Smith murder, when considering Carter's motion for judgment of acquittal or for a new trial. First, the Court would not and could not consider evidence NOT presented to the jury when assessing the sufficiency of the evidence as to the jury's verdict. Further, the Court rejected Garcia's argument that the post-trial disclosure of Floy's phone extraction sufficiently undermined Floy's credibility as to render his testimony unavailing to the Government's case. Having so concluded, the Court does not further address this request by Carter or the impact of the Court's determination following the *Fatico* hearing on Carter's motions.

He indicated that he was not contesting the charge and then quickly moved on to the focus of his argument—whether the evidence established Gilbert's involvement in the murder of Ty'Quess Moore beyond a reasonable doubt.

At trial, Carter did contest the RICO conspiracy charge, specifically whether ONE could ever be found to be an "enterprise" as that term was defined for the jury by the Court. During cross-examination, counsel elicited that ONE had no written rules, by-laws, a charter, or any other form of organizational documentation. He elicited that they did not have a treasury or a bank account and that they did not pool drug profits. He argued in closing that ONE was not an enterprise and that therefore the Government had failed to meet its burden as to Count One.

During the trial and in the instant motion, Carter asserted and asserts that he was irreparably prejudiced by Gilbert's trial strategy; that the Court should have declared a mistrial in light of this prejudice; that the jury could not fairly assess the evidence against Carter in light of Gilbert's concession. The Government disagrees.

Rule 14 of the Federal Rules of Criminal Procedure permits severance of properly joined defendants,[6] at the discretion of the trial court, to avoid prejudice to a defendant or the Government. Fed. R. Crim. P. 14(a). Nevertheless, there is a strong and well-settled preference that defendants who are indicted together should be tried together. *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003); *see also Richardson v. Marsh*, 481 U.S. 200, 209 (1987) ("Joint trials play a vital role in the criminal justice system . . . ."). "This preference is particularly strong where . . . the defendants are alleged to have participated in a common plan or scheme." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998); *see also*

---

[6] Rule 8 of the Federal Rules of Criminal Procedure provides that "[t]he indictment . . . may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b).

14

*United States v. Cardascia*, 951 F.2d 474, 482–83 (2d Cir. 1991). As the Supreme Court has explained:

> It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. . . . Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

*Richardson*, 481 U.S. at 210.

A defendant claiming prejudice by joinder must demonstrate prejudice that is "sufficiently severe [as] to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." *United States v. Lanza*, 790 F.2d 1015, 1019 (2d Cir. 1986) (quoting *United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984)). District courts have wide discretion in deciding whether to sever trials, and a defendant seeking review of a denial of severance under Rule 14 bears an "extremely difficult burden." *United States v. Casamento*, 887 F.2d 1141, 1149–50 (2d Cir. 1989) (internal quotation marks omitted). "It is not enough to demonstrate that separate trials would have increased the chances of the appellant's acquittal . . . the defendant must instead show prejudice so severe that his conviction constituted a miscarriage of justice," and that the denial of the motion to sever "amounted to a denial of a constitutionally fair" trial. *United States v. Scott*, 637 F. App'x 10, 13 (2d. Cir. 2015) (summary order) (alternations and internal quotation marks omitted) (quoting *United States v. Spinelli,* 352 F.3d 48, 54–55 (2d Cir. 2003)). Finally, even where prejudice is shown, severance is not required. *Zafiro,* 506 U.S. at 538–39. Rather the trial court can fashion appropriate relief tailored to the circumstances presented. *Id.* Where curative measures are available and are taken in order to reduce or eliminate prejudice to the defendant, neither severance nor, as sought here, a new trial is warranted. *See id.* at 539 ("[A]s we indicated

15

in *Richardson v. Marsh*, [481 U.S. at 211,] less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.").

Although acknowledging that this "is not a case involving mutually antagonistic defenses,"[7] Def.'s Mem. in Supp., ECF No. 1308, at 7, Carter nonetheless asserts that his co-defendant's trial strategy resulted in "prejudice so severe that his conviction constituted a miscarriage of justice, and that the denial of his motion [for severance or mistrial] constituted an abuse of discretion." *Id.* (quoting *United States v. Hernandez*, 85 F.3d 1023, 1029 (2d Cir. 1996)).

The Court does not agree that Gilbert's trial strategy and/or concession deprived Carter of a fair trial. Gilbert's concession that he was not contesting his guilt on Count One says nothing about the strength of the Government's case against Carter. That his lawyer chose to concede *Gilbert's* participation in the alleged racketeering conspiracy is irrelevant to the jury's task of assessing the existence of the conspiracy or *Carter's* alleged participation in the conspiracy. The jurors were explicitly instructed as follows:

> You must consider Count One against each defendant separately and return a separate verdict of not guilty or guilty as to each defendant. Further, whether you find Mr. Gilbert guilty or not guilty as to Count One, should not have any bearing on whether you find Mr. Carter guilty or not guilty on Count One. Each defendant must be deliberated upon separately.

---

[7] Although the existence of antagonistic defenses is not a *per se* basis for severance, *Cardascia*, 951 F.2d at 484, severance may be appropriate where a defendant demonstrates that the defenses "conflict to the point of being so irreconcilable as to be mutually exclusive." *Id.* To meet this heavy burden, "the defendant must make a factual demonstration that acceptance of one party's defense would tend to preclude the acquittal of the other." *Salameh*, 152 F.3d at 116 (alterations and internal quotation marks omitted). Or the defendant must show that "the *essence* of the defenses prevails to such a degree—even without being mutually exclusive—that the jury unjustifiably infers that the conflict [in defenses] alone indicated that both defendants were guilty." *Cardascia*, 951 F.2d at 484 (emphasis in original); *see also United States v. Berkowitz*, 662 F.2d 1127, 1134 (5th Cir. 1981) ("Where two defendants present defenses that are antagonistic at their core, a substantial possibility exists that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty. If the essence of one defendant's defense is contradicted by a co-defendant's defense, then the latter defense can be said to 'preempt' the former." (citations and internal quotation marks omitted)).

Jury Instructions, ECF No. 1080, at 5. After closing arguments, Carter moved for a mistrial based upon the concession made during closing arguments by Gilbert's lawyer. Trial Tr. 11/16/2023 A.M., ECF No. 1347, at 112:3–113:7. The Court denied the mistrial but instructed the jury further:

> I must add a few general instructions concerning your deliberation. I previously instructed you that you are required to deliberate as to each defendant separately and that your verdict as to one must have no bearing on your verdict as to the other. *Therefore, whatever arguments or positions that may have been advanced by one defendant should not enter into your deliberations with respect to the other defendant.*

Trial Tr. 11/16/2023 P.M., ECF No. 1348, at 64:23–65:2. Juries are presumed to follow their instructions. *Richardson*, 481 U.S. at 211.

Accordingly, Carter has not demonstrated "prejudice so severe" that he was deprived of a constitutionally fair trial.

**Conclusion**

For the foregoing reasons, Carter's motion for judgment of acquittal or in the alternative a new trial is DENIED.

**SO ORDERED** at Bridgeport, Connecticut, this 13th day of January, 2025.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE